1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

IGNACIO FLETES VERA,               ) Case No. CV 12-7078-SS
                                   )
              Plaintiff,           )
                                   )
         vs.                       )
                                   ) MEMORANDUM OPINION AND ORDER
CAROLYN W. COLVIN, Acting          )
Commissioner of Social             )
Security,[1]                       )
                                   )
              Defendant.           )
                                   )

**I.    PROCEEDINGS**

    Plaintiff Ignacio Fletes Vera ("Plaintiff") seeks review of
the Commissioner's final decision denying his application for
Social Security disability insurance benefits ("DIB").  The parties
consented to the jurisdiction of the undersigned U.S. Magistrate
Judge pursuant to 28 U.S.C. § 636(c).  This matter is before the
Court on the parties' Joint Stipulation, filed May 28, 2013, which

_____

    [1]    On February 14, 2013, Colvin became the Acting
Commissioner of Social Security.  Pursuant to Federal Rule of
Civil Procedure 25(d), the Court therefore substitutes Colvin for
Michael J. Astrue as the proper Respondent.

1

the Court has taken the motion under submission without oral argument. For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

## II.  BACKGROUND

Plaintiff was born on July 31, 1965 and was thirty-nine, a younger individual, at the time of the hearing. (Administrative Record ("AR") 18, 91, 175.) He finished high school and an associate degree. (AR 19-20.) He previously worked as a tool-crib attendant in the aerospace industry, a tool-truck operator in the Army, a parts-delivery person at a car dealership, a slot representative and slot supervisor at casinos, and a stocker at Walmart. (AR 21-36.)

On August 12, 2008, Plaintiff filed an application for DIB. (AR 175-77.) Plaintiff alleged that he had been unable to work since June 30, 2005, because of major depression, posttraumatic stress disorder, a kidney condition, a back condition, and migraine headaches. (AR 175, 211.) After his application was denied on initial review and reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 104-09, 112-16, 118-19.) A hearing was held on June 11, 2010, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert ("VE"). (AR 14-69.) In a written decision issued November 22, 2010, the ALJ found that Plaintiff was not disabled. (AR 78-93.) Plaintiff requested that the Appeals Council review the ALJ decision and submitted additional argument and evidence, including

Department of Veterans Affairs ("VA") treatment notes dating through May 2011. (AR 257-91, 685-750.) On June 22, 2012, the Appeals Council noted that the new information "d[id] not provide a basis for changing the [ALJ's] decision" and denied his request for review. (AR 97-102.) The Council also noted that some of the submitted medical evidence postdated the ALJ's November 22, 2010 decision and therefore "d[id] not affect the decision about whether [he was] disabled beginning on or before" that date.[2] (AR 98.) This action followed.

### III.  STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine

---

[2]    The Appeals Council informed Plaintiff that "[i]f you want us to consider whether you were disabled after November 22, 2010, you need to apply again" and that it would use the date of Plaintiff's request for review as the date of his new claim. (AR 98.)

whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996). Moreover, "when the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence." Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1163 (9th Cir. 2012); see also Taylor v. Comm'r of Soc. Sec. Admin., 659 F.3d 1228, 1232 (9th Cir. 2011). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

**IV. THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

\\
\\
\\
\\

4

1       A.    <u>The Five-Step Evaluation Process</u>

2

3       The ALJ follows a five-step sequential evaluation process in

4 assessing whether a claimant is disabled. 20 C.F.R.

5 § 404.1520(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir.

6 1995) (as amended Apr. 9, 1996). In the first step, the

7 Commissioner must determine whether the claimant is currently

8 engaged in substantial gainful activity; if so, the claimant is not

9 disabled and the claim must be denied. § 404.1520(a)(4)(I). If

10 the claimant is not engaged in substantial gainful activity, the

11 second step requires the Commissioner to determine whether the

12 claimant has a "severe" impairment or combination of impairments

13 significantly limiting his ability to do basic work activities; if

14 not, a finding of not disabled is made and the claim must be

15 denied. § 404.1520(a)(4)(ii). If the claimant has a "severe"

16 impairment or combination of impairments, the third step requires

17 the Commissioner to determine whether the impairment or combination

18 of impairments meets or equals an impairment in the Listing of

19 Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart

20 P, Appendix 1; if so, disability is conclusively presumed and

21 benefits are awarded. § 404.1520(a)(4)(iii). If the claimant's

22 impairment or combination of impairments does not meet or equal an

23 impairment in the Listing, the fourth step requires the

24 Commissioner to determine whether the claimant has sufficient

25 residual functional capacity ("RFC")[3] to perform his past work; if

26

27     [3]    RFC is what a claimant can still do despite existing

28 exertional and nonexertional limitations. 20 C.F.R. § 404.1545; <u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

so, the claimant is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving that he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v). That determination comprises the fifth and final step in the sequential analysis. § 404.1520; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

    B.    The ALJ's Application of the Five-Step Process

    At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since June 30, 2005. (AR 80.) At step two, the ALJ concluded that Plaintiff had the severe impairments of

> [m]ild-to-moderate degenerative disc and joint disease, lumbosacral spine, including bilateral L5-S1 pars defect, stable, and without significant spondylolisthesis; nephropathy, presumed IgA although biopsy was non-diagnostic,[4] resulting in chronic kidney disease,

_____

[4]    "Nephropathy is damage, disease, or other problems with the kidney." IgA nephropathy, MedlinePlus, http://www.nlm.nih. gov/medlineplus/ency/article/000466.htm (last updated Mar. 22, 2013). "IgA nephropathy is a kidney disorder in which antibodies called IgA build up in kidney tissue." Id. Symptoms include

1    arrested at stage 3, and currently inactive with labs
2    improving; obstructive sleep apnea, improved after
3    parathyroid surgery, no longer on CPAP;[5] infrequent
4    migraine headaches; hypertension, controlled on
5    medication; parathyroid adenoma,[6] excised in March 2008;
6    \\
7    \\
8    \\
9    \\
10   \\
11   \\
12   \\
13   \\
14   \\
15   \\
16   \\

17   _____

18   dark or bloody urine, swelling of the hands and feet, and
19   symptoms of chronic kidney disease.  <u>Id.</u>  The goal of treatment
     is to relieve symptoms and prevent or delay chronic renal
20   failure.  <u>Id.</u>

21        [5]  "CPAP" stands for continuous positive airway pressure.
22   <u>Sleep Apnea Health Center</u>, WebMD, http://www.webmd.com/
     sleep-disorders/sleep-apnea/continuous-positive-airway-pressure-c
23   pap-for-obstructive-sleep-apnea (last updated June 17, 2011).
     CPAP therapy uses a machine to help a person who has obstructive
24   sleep apnea breathe more easily during sleep.  <u>Id.</u>

25        [6]  "A parathyroid adenoma is a noncancerous (benign) tumor
     of the parathyroid glands, which are located in the neck."
26   <u>Parathyroid adenoma</u>, MedlinePlus, http://www.nlm.nih.gov/
     medlineplus/ency/article/001188.htm (last updated July 19, 2012).
27   "Parathyroid adenomas are the most common cause of
     hyperparathyroidism (overactive parathyroid glands), which leads
28   to increased blood calcium levels."  <u>Id.</u>

mild osteopenia,[7] in femur only, not in spine; mild
degenerative joint disease, left knee; remote history of
left elbow injury with apparent intra-articular loose
body on x-rays; obesity, improving (68 inches tall, 256-
to-229 pounds, BMI 39-to-45); major depressive disorder;
and dysthymia.

(AR 80.)  At step three, the ALJ determined that Plaintiff's
impairments did not meet or equal any of the impairments in the
Listing.  (AR 83.)  At step four, the ALJ found that Plaintiff
retained the RFC to perform:

work activity at the sedentary exertional level,[8] lifting
and carrying up to ten pounds, sitting for six hours per
eight-hour workday, and standing and walking for two
hours per eight-hour workday, with no pushing or pulling
in the operation of machinery with the non-dominant left
upper extremity, and with the following nonexertional

---

[7]  "Osteopenia refers to bone mineral density (BMD) that
is lower than normal peak BMD but not low enough to be classified
as osteoporosis." Osteoporosis - Overview, WebMD, http://www.webmd
.com/osteoporosis/tc/osteoporosis-overview (last updated Feb. 23,
2011).  "Having osteopenia means there is a greater risk that, as
time passes, [a person] may develop BMD that is very low compared
to normal, known as osteoporosis." Id.  Osteopenia has no
symptoms, although the risk of breaking a bone increases as the
bone becomes less dense. Id.

[8]  "Sedentary work" involves "lifting no more than 10
pounds at a time and occasionally lifting or carrying articles
like docket files, ledgers, and small tools." 20 C.F.R. §
404.1567(a).  Sedentary work involves sitting most of the time
but may involve occasional walking or standing for brief periods
of time. Id.

1    limitations: never climbing ladders, ropes or scaffolds;
2    occasionally climbing ramps and stairs; occasionally
3    stooping and crouching; never balancing, kneeling, or
4    crawling; avoiding concentrated exposure to dangerous
5    moving machinery, electric shock, radiation and
6    unprotected heights; avoiding concentrated exposure [to]
7    extremes of heat, cold and humidity; and mentally limited
8    to unskilled work with no close or frequent interpersonal
9    contact with supervisors, co-workers, or the public.

10
11   (AR 84.)   Based on the VE's testimony, the ALJ concluded that
12   Plaintiff was capable of performing jobs that existed in
13   significant numbers in the national economy.   (AR 91-92.)
14   Accordingly, the ALJ determined that Plaintiff was not disabled.
15   (AR 92-93.)

16
17   **V.    RELEVANT FACTS**

18
19       On August 6, 2005, a doctor at the Inland Psychiatric Medical
20   Group, Inc., diagnosed Plaintiff with bipolar disorder, mixed type.
21   (AR 295.)   The doctor found that Plaintiff had a labile affect and
22   depressed and anxious mood but was well-groomed; had calm motor
23   activity and intact thought process, memory, and judgment; and did
24   not have hallucinations or delusions.   (Id.)   The doctor opined
25   that Plaintiff's mental condition had no effect on his relationship
26   with his wife, a mild effect on his relationship with his family
27   and health, and a severe effect on his other primary relationships
28   and his ability to work.   (Id.)

On January 14, 2005, Plaintiff underwent a renal biopsy through the VA healthcare system.[9]  (AR 311-12.)  On March 14, 2005, Plaintiff was diagnosed with a left renal hematoma resulting from the renal biopsy.  (AR 306-08.)  He was prescribed morphine to control his pain.  (AR 308.)

On December 19, 2005, x-rays of Plaintiff's lumbar spine showed mild to moderate L1/L2 spondylosis and degenerative disc disease, mild L5/S1 degenerative disc disease, and L4-S1 facet arthritis.  (AR 384.)  On January 25, 2006, parathyroid imaging showed a parathyroid adenoma.  (AR 554-55.)

On August 3, 2007, Dr. Donald Martindill examined Plaintiff as part of Plaintiff's application for VA benefits, noting that Plaintiff was seeking "individual unemployment."[10]  (AR 380-83.) Dr. Martindill noted that Plaintiff had served in the Army from February 1996 to August 1998, when he was honorably discharged. (AR 380.)  Dr. Martindill noted that Plaintiff "became depressed after injuring his elbow" in the service but was never in combat. Plaintiff reported that he had "massive financial problems," his marriage was "stressful," his wife was "continually on his back," and he had "a strong sex drive, but his wife [was] not quite up to

---

[9]    Unless otherwise noted, all of Plaintiff's medical treatment has been through the VA.

[10]    VA regulations state that a veteran may receive a "[t]otal disability rating" based on the "unemployability of the individual" when he or she is "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities" that are "rated" by the VA as at least 60 or 70 percent disabling.  38 C.F.R. § 4.16(a).

speed in that department." (Id.) Dr. Martindill found that
Plaintiff felt "picked on" with "low-grade paranoia" but was "not
psychotic." (Id.) Dr. Martindill noted that Plaintiff complained
of depression without suicidal ideation and worried that he would
never be able to keep a job. (AR 381.) Dr. Martindill's mental-
status examination revealed:

> [a] veteran who thought it was August 5, 2007, rather
> than August 3, 2007. He knew the current officeholders
> and intercity distances but had no idea as to the
> distance to New York City. He would not even make a
> guess. His IQ was in the average range. He has an AA
> degree. He was cognitively intact, but his mentation
> seemed slow. He put little effort into the examination.
> He did well naming presidents backwards, adequately on
> the serial 7's. Concentration was poor. He had "I don't
> give a shit attitude." He was serious-minded. He spoke
> only when spoken to. His affect was dull, his mood
> depressed, but he was not psychotic. He only gets 5
> hours of sleep per night. His wife apparently turns him
> down for sex occasionally, if not frequently. He has not
> seen a psychiatrist for quite a long time. He just gets
> his medication refilled.

(Id.) Dr. Martindill noted that Plaintiff indicated that he did
not care whether he lived or died "but [was] willing to get his
kidney status checked and see a neurologist for his migraine
headaches." (Id.) He noted that Plaintiff did not have an

"impulse problem" and denied ever having alcohol or drug problems, which was "quite hard to believe." (AR 382.) Dr. Martindill diagnosed "[m]ajor depressive disorder, ongoing" and a global assessment of functioning ("GAF") score of 50 and noted that Plaintiff had "prominent" passive-aggressive traits but did not have a "full-blown" personality disorder.[11] (AR 382-83.)

Dr. Martindill opined that Plaintiff's depressive disorder had a "moderately severe" effect on his occupational and social functioning, but that "with more aggressive treatment and closer monitoring and possible group therapy, anger management, and other changes in a therapeutic approach, including a possible consideration of other anti-depressants or even psychostimulants, it is more likely than not that the veteran could obtain work." (AR 383.) Dr. Martindill noted that he "frankly [did] not feel [he could] recommend unemployability status to this individual at this early age," and that "it seems . . . something could be done with this relatively young individual with a past history of good work performance . . . to get back to a status where he could be employed." (Id.)

\\

\\

---

[11]  A GAF score represents a rating of overall psychological functioning on a scale of 0 to 100. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Disorders, Text Revision 34 (4th ed. 2000). A GAF score in the range of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id.

Dr. Martindill noted that Plaintiff was "unmotivated for further work," had indicated he had "no will to live" but had never been hospitalized and was "not felt to be a danger to self or others." (Id.)

On October 30, 2007, primary-care physician Dr. Laura M. Kim noted that Plaintiff had missed medical appointments for the past 18 months because he "felt frustrated with his [appointments]" and felt that "no one cares." (AR 582.)  Dr. Kim noted that Plaintiff had IgA nephrology and chronic kidney disease, parathyroid adenoma, depression, "controlled" hypertension, chronic pain, and osteopenia because of his hyperparathyroidism.[12]  (AR 585-86.)  She noted that Plaintiff "did not complain much of pain during visit" and recommended that he continue taking "apap," or acetaminophen.[13]  (AR 586.)

On November 16, 2007, Dr. Kim noted that Plaintiff reported that his depression started when he joined the Army ten years earlier. (AR 579.)  Dr. Kim noted that Plaintiff had injured his elbow early in the training and "still holds anger and resentment about not having advanced onward in rank while others who came in

---

[12]    Hyperparathyroidism is a disorder in which the parathyroid glands in the neck produce too much parathyroid hormone, which controls calcium, phosphorus, and vitamin D levels in the blood and bone.  Hyperparathyroidism, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/001215.htm (last updated Mar. 22, 2013).

[13]    APAP is another term for acetaminophen.  Acetaminophen, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681004.html (last updated July 15, 2013).

after him did." (Id.)  Plaintiff said that he had hard time holding a job because "any sight of 'injustice' towards anyone around him gets him angry."  (AR 580.)  Dr. Kim diagnosed mixed depression and posttraumatic stress disorder, prescribed medications, advised him to seek counseling, and referred him to psychiatry.  (Id.)  Dr. Kim also noted that Plaintiff complained of back pain related to his renal biopsy, but that testing did not reveal a cause of his pain.  (Id.)  She advised him to continue taking acetaminophen and referred him to physical therapy.  (Id.)

On December 3, 2007, Dr. Ken J. Park noted that Plaintiff suffered from IgA nephropathy, hypertension, depression, stage-three chronic kidney disease, parathyroid adenoma, obstructive sleep apnea "on CPAP," and osteopenia.  (AR 575, 577.)  Dr. Park noted that Plaintiff was not taking any over-over-the-counter medications and that his chronic kidney disease was "presumed" to be caused by IgA nephropathy even though Plaintiff's renal biopsy had been "nondiagnostic."  (AR 575, 577.)  Dr. Park noted that Plaintiff complained of "flank pain," ordered a renal ultrasound, and instructed Plaintiff to return in one year.  (AR 577.)  On December 4, 2007, Dr. Sumana Jothi noted that Plaintiff had transient increased calcium levels and other findings consistent with parathyroid adenoma.  (AR 573.)  Plaintiff was scheduled for a parathyroidectomy.  (AR 573-74.)

On December 13, 2007, Dr. Julie M. Wilcox, who was board-certified in psychiatry and neurology (AR 315), noted that Plaintiff's last psychiatric appointment had been with a different

14

doctor in May 2006. (AR 571.) At that time, Plaintiff's diagnosis was dysthymia with superimposed major depressive episode and his GAF score was 55.[14] (Id.). Plaintiff reported that he had stopped going to his appointments because he "did not feel he was being treated with respect by any of his doctors and was concerned that he couldn't be around people [because] of his anger." (AR 572.) Plaintiff reported anger, bad mood, middle insomnia, anhedonia, decreased short-term memory and concentration, feelings of worthlessness and hopelessness, poor motivation, and occasional suicidal ideation. (Id.) Dr. Wilcox noted that Plaintiff had a tired, mildly sad affect but was alert and oriented with good hygiene and eye contact, normal speech, goal-directed thoughts, and intact insight and judgment. (Id.) She prescribed medication and referred Plaintiff to anger management. (Id.)

On December 13, 2007, an echogram showed signs "consistent with medical renal disease" and a nine-millimeter cyst in the midpole of the right kidney. (AR 440.) On January 10, 2008, Dr. Jhanna Nariyants noted that Plaintiff had hypercalemia related to primary hyperparathyroidism and was scheduled to have a parathyroidectomy. (AR 567-71.)

\\

\\

---

[14] A GAF score in the range of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." See Am. Psychiatric Ass'n, supra, at 34.

On January 30, 2008, Dr. Wilcox noted that Plaintiff reported that his medications were not helping, his "[s]evere irritability and anger is ruining his marriage and negatively affecting his relat[ionships] with his children." (AR 566.) Plaintiff reported that he was tired of his medication because of sexual side effects and was "desperate to get better." (Id.) Dr. Wilcox noted that Plaintiff had a "[d]istressed and irritable mood and affect," his speech was raised at times with "mild pressure," but he was alert and oriented with good hygiene and eye contact, goal-directed thoughts, and intact insight and judgment. (AR 566-67.)

On February 4, 2008, Dr. Kim changed Plaintiff's hypertension medication, noted that he was using his CPAP machine for an hour a night and recommended that he use it more, and recommended diet and exercise to help resolve his obesity and depression. (AR 565.) Dr. Kim noted that Plaintiff complained of migraine headaches with "unusual characteristic" but had a negative neurological exam; she recommended that he take acetaminophen as needed. (AR 566.)

On March 5, 2008, Plaintiff was noted to have hyperparathyroidism and underwent a parathyroidectomy. (AR 370-71, 437-38, 470-72.) Pathology findings were consistent with parathyroid adenoma. (AR 441.) On March 7, 2008, Plaintiff was discharged in good condition. (AR 412, 470-71.) On March 13, 2008, Dr. Cyrus Torchinsky noted that Plaintiff was doing well after his parathyroidectomy. (AR 408.)

\\

\\

On March 27, 2008, Dr. Wilcox noted that Plaintiff had not seen any changes with his psychiatric medication, his nightmares were worse and sleep poor, and he was more restless and irritable. (AR 407.)  Plaintiff was alert and oriented, with normal speech, good hygiene and eye contact, goal-directed thoughts, and intact insight and judgment.  (Id.)  She diagnosed recurrent major depressive disorder and dysthymia.  (Id.)

On April 3, 2008, Dr. Karl Y. Hostetler noted that Plaintiff was doing well after his parathyroidecnomy and had "no hypocalcemia" and normal levels calcium and "pth," or parathyroid hormone.[15]  (AR 406.)  He recommended that Plaintiff follow up in six months.  (Id.)

On May 15, 2008, Dr. Wilcox noted that Plaintiff reported that he "does not care about anything or anyone, feels nothing."  (AR 402.)  Plaintiff was alert and oriented with normal speech, good hygiene and eye contact, goal-directed thoughts, and intact insight and judgment.  (Id.)  Dr. Wilcox diagnosed major depressive disorder, recurrent and dysthymic and advised him to return in six weeks.  (Id.)

On May 27, 2008, Dr. Kim noted that Plaintiff complained of left-sided post-biopsy back pain that was nonradiating, felt better with activity, and did not interfere with Plaintiff's sleep.  (AR

---

[15]    PTH stands for parathyroid hormone.  PTH, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003690.htm (last updated Mar. 22, 2013).

395.)  Plaintiff said that acetaminophen was not working and he wanted "something to bring the level down" and that he was sleeping better and walking with his family almost daily.  (AR 395, 397.) Dr. Kim found that Plaintiff weighed 259 pounds, had tenderness to palpation in the mid-thoracic area on the left, full range of motion but some pain, no active spasms, and 5/5 lower-extremity strength.  (Id.)  She noted that x-rays and CT scans were negative for a source of Plaintiff's back pain, advised him to continue daily walking, and prescribed acetaminophen with codeine.  (AR 398.)

On June 19, 2008, Dr. Wilcox noted that Plaintiff was being evicted from his home and that since he had started receiving "100% disability he [had not] been able to work and therefore [could not] provide for his family."  (AR 393.)  Plaintiff reported a "definite benefit" from his medications and said that he was sleeping six hours straight each night.  (Id.)  Dr. Wilcox noted that Plaintiff had a "stressed" mood and "congruent, frustrated affect," but he was alert and oriented, with normal speech, good hygiene and eye contact, goal-directed thoughts, and intact insight and judgment. (Id.)  She diagnosed recurrent major depressive disorder and dysthymia and recommended that he return in six to eight weeks. (AR 393-94.)

On August 7, 2008, Dr. Wilcox noted that Plaintiff and his family were living with Plaintiff's mother, which Plaintiff found "extremely stressful."  (AR 392.)  Plaintiff reported that his depression had worsened, his sleep was poor, and he was isolating

himself.  (Id.)  He requested "a letter stating his treatment for his application for social security disability." (Id.)  Dr. Wilcox found that Plaintiff had a "[d]epressed mood and affect" but was alert and oriented with normal speech, goal-directed thoughts, and intact judgment and insight.  (Id.)  She diagnosed recurrent major depressive disorder and dysthymia and recommended that he return in six weeks.  (AR 392.)

Also on August 7, 2008, Dr. Wilcox wrote a letter stating that Plaintiff was compliant with his treatment but it had been "difficult to get his illness stabilized with a medication regimen and therefore he continues to be quite depressed." (AR 315.)  She listed his symptoms as depressed mood, isolation, irritability, insomnia, decreased daytime energy, poor short-term memory, poor attention span, decreased concentration, passive thoughts of death, and decreased motivation.  (Id.)  She found that, "[b]ecause of this, in no way is he able to obtain or maintain gainful employment." (Id.)

On September 5, 2008, a Social Security Administration ("SSA") consulting doctor, K. Loomis, reviewed Plaintiff's medical records and completed a psychiatric-review-technique form at the SSA's request.  (AR 316-26.)  Dr. Loomis found that Plaintiff had a depressive disorder that resulted in no restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (AR 319, 324.)  Dr. Loomis concluded that Plaintiff's impairments

were not severe.  (AR 316.)  On September 11, 2008, another SSA consulting doctor, Thu N. Do, reviewed the record and affirmed Dr. Loomis's assessment.  (AR 329.)

On September 2, 2008, Dr. Mounir Soliman, who was board certified in psychiatry and neurology, examined Plaintiff at SSA's request.  (AR 339-43.)  Dr. Soliman noted that Plaintiff was "pleasant and cooperative" throughout the interview.  (AR 339.) Plaintiff reported that he had had nightmares and flashbacks since being injured during military training.  (AR 339-40.)  Dr. Soliman noted that Plaintiff was able to cook, clean, shop, run errands, take care of his own personal hygiene, drive a car, and take care of his own finances.  (AR 341.)  Plaintiff reported that he got along well with family, friends, and neighbors and was able to focus on his daily activities.  (Id.)

Upon examination, Dr. Soliman found that Plaintiff was able to recall three of three objects in five minutes and perform serial sevens without error.  (AR 341.)  Plaintiff had intact memory, normal abstract thinking, and good insight.  (AR 341-42.)  Dr. Soliman diagnosed "moderate" major depression and assigned a GAF score of "about 66."[16]  (AR 342-43.)  He concluded that, from a psychiatric standpoint, Plaintiff was able to understand, carry

[16]   A GAF score in the range of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  See Am. Psychiatric Ass'n, supra, 34.

out, and remember simple and complex instructions; interact with coworkers, supervisors, and the general public; and "withstand the stress and pressures associated with an eight-hour workday, and day-to-day activities." (AR 343.)  Dr. Soliman believed that Plaintiff had a "fair" prognosis and that his condition would be manageable with appropriate treatment. (Id.)

On September 8, 2008, Dr. Hau H. Tan, who was board-certified in internal medicine, examined Plaintiff at the SSA's request. (AR 331-35.)  Dr. Tan noted that Plaintiff complained of low-back pain, left-elbow pain, left-knee pain, and migraine headaches. (AR 331.) Plaintiff weighed 256 pounds and his grip strength was 125/130/125 on the right and 45/45/35 on the left. (AR 333.)  Plaintiff had slight tenderness to palpation of the left flank, a negative straight-leg-raising test, no effusion or instability of the knees, and normal ranges of motion of the back, hips, knees, and ankles. (AR 333-34.)  Plaintiff had a normal gait, good muscle tone bilaterally with good active motion, 5/5 strength in all extremities, intact sensation, and normal reflexes. (AR 334-35.) Dr. Tan believed that Plaintiff could perform medium work and lift and carry 50 pounds occasionally and 25 pounds frequently. (AR 335.)  Plaintiff had unlimited ability to walk, stand, sit, push, and pull. (Id.)

On September 11, 2008, a SSA consulting physician, Dr. T. Do, reviewed Plaintiff's records and completed a physical-RFC assessment. (AR 346-50.)  Dr. Do noted Plaintiff had low-back pain and opined that he was limited to lifting 50 pounds occasionally

and 25 pounds frequently, standing and walking for about six hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday.  (AR 346.)

On December 1, 2008, Dr. Ali Kashkouli in the nephrology department noted that Plaintiff was doing "quite well."  (AR 388-89.)  Plaintiff was "essentially non proteinuric"[17] and had "normal sleep wake cycles," "good appetite," good blood pressure control, and "ok" calcium levels.  (AR 388-89.)  Planitiff was instructed to return to the nephrology department in one year.  (AR 389.)

On December 11, 2008, Dr. Wilcox noted that Plaintiff reported middle insomnia, depression, nightmares, and decreased energy but he had a normal appetite and no suicidal ideation.  (AR 387.)  Upon examination, Plaintiff had a dysphoric mood and tired affect but was alert and oriented with normal speech, good hygiene and eye contact, goal-directed thoughts, intact insight and judgment. (Id.)  Dr. Wilcox diagnosed recurrent major depressive disorder and dysthymia and told him to return in two months.  (Id.)

On December 17, 2008, a SSA consulting psychiatrist, Dr. B. A. Smith, reviewed Plaintiff's medical records and agreed with the earlier opinions that Plaintiff's mental impairment was not severe. (AR 358-59.)

---

[17]   People with proteinuria have urine with an abnormal amount of protein.  Protein in Urine (Proteinuria), WebMD, http://www.webmd.com/a-to-z-guides/proteinuria-protein-in-urine (Mar. 14, 2012).  The condition is often a sign of kidney disease.  (Id.)

On December 19, 2008, Dr. Susan E. Trompeter noted that Plaintiff weighed 255 pounds and had tenderness at L5/S1 but no straight-leg-raising pain. (AR 383-84.) Plaintiff reported that he was not working because "his psychiatrist [would] not clear him to return to work." (AR 383.) Dr. Trompeter recommended that Plaintiff treat his low-back pain with strengthening and stretching exercises and walking and that he "return to work as soon as psychiatry can clear." (AR 386.)

On January 21, 2009, a SSA consulting physician, Dr. D. Rose, reviewed Plaintiff's medical records and found that Plaintiff could perform medium work. (AR 359.)

On February 25, 2009, Dr. Wilcox noted that Plaintiff complained of "severe migraine headaches" and "continue[d] to be depressed with anhedonia." (AR 485.) Plaintiff was seeking Social Security and VA benefits and "wish[ed] he could get back to work." (AR 485.) Dr. Wilcox noted that Plaintiff had a depressed mood and affect but was alert and oriented with normal speech, good hygiene and eye contact, goal-directed thoughts, and intact judgment. (AR 485-86.) Dr. Wilcox diagnosed recurrent major depressive disorder and dysthemia. (AR 486.)

On April 9, 2009, Dr. Wilcox noted that Plaintiff reported feeling "numb" and always "on the alert" but that his irritability had decreased. (AR 485.)

\\

\\

1  Dr. Wilcox noted that Plaintiff was alert and oriented with normal
2  speech, good hygiene and eye contact, "neutral mood and affect,"
3  goal-directed thoughts, and intact insight and judgment. (Id.)
4
5      On May 13, 2009, Dr. Wilcox noted that Plaintiff's mood and
6  sleep had improved and his irritability had decreased with
7  medication. (AR 484.) She noted that Plaintiff had a "[e]uthymic
8  affect" and was alert and oriented with normal speech, good hygiene
9  and eye contact, goal-directed thoughts, and intact judgment.
10 (Id.)  She diagnosed recurrent major depressive disorder and
11 dysthymia and recommended that he return in two months. (Id.)
12
13     On June 11, 2009, Dr. Wilcox noted that Plaintiff had not been
14 doing well over the past week because of his daughter's child-
15 custody problems but that "[p]rior to last week he was doing well,"
16 his mood was improved, and he "felt good." (AR 482.) Dr. Wilcox
17 noted that Plaintiff said that he "felt at ease right now" and was
18 alert and oriented with normal speech, good hygiene and eye
19 contact, goal-directed thoughts, and intact judgment. (Id.)
20
21     On July 9, 2009, Dr. Wilcox noted that Plaintiff's daughter
22 was having problems with child custody and that Plaintiff had been
23 "extremely angry, ready to 'hurt' anyone." (AR 480-81.) Dr.
24 Wilcox noted that Plaintiff was alert and oriented with normal
25 speech, good hygiene and eye contact, goal-directed thoughts, and
26 intact judgment. (AR 481.)
27 \\
28 \\

24

On August 6, 2009, Dr. Wilcox noted that Plaintiff's physical pain was increasing but that he was "controlling his intense anger towards everything." (AR 479.)  Plaintiff had a "[d]ysphoric mood and affect" but was alert and oriented with normal speech, good hygiene and eye contact, goal-directed thoughts, and intact insight and judgment. (Id.)

On August 24, 2009, Dr. Trompeter noted that Plaintiff was no longer using his CPAP machine because he felt that he did not need it after his parathyroid was removed. (AR 473.)  Plaintiff had lost 20 pounds, bringing his weight down to 229 pounds, which he attributed to "better dietary choices." (Id.)  Plaintiff also reported that he had moved to a new home with a pool and had been swimming since May 2009. (Id.)  Dr. Trompeter noted that Plaintiff "has five children and had a great summer with them but for the last month they have been back at school." (Id.)  Dr. Trompeter noted that Plaintiff's hypertension was in "[g]ood control" but that Plaintiff reported pain in his elbow, knees, and back and requested x-rays. (AR 474.)  She noted that Plaintiff's medications included gabapentin for pain.[18]  (AR 473-74.)

On August 24, 2009, an x-ray of Plaintiff's left knee showed "[s]table, mild joint space narrowing of the medial femorotibial compartment" but was "otherwise unremarkable." (AR 453.)  An x-ray

---

[18]    Gabapentin is an anticonvulsant that is used to relieve certain types of pain. Gabapentin, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last updated July 25, 2013).

of the left elbow showed no acute injury and a "[p]robable interarticular body of the radial aspect of the left elbow joint." (AR 454.)  X-rays of his lumbar spine showed bilateral L5 pars defects without significant anterolisthesis of L5 on S1 and mild progression of degenerative disc disease since Plaintiff's December 2005 x-ray.  (AR 455.)

On September 17, 2009, Dr. Wilcox noted that Plaintiff was sleeping better and his pain was more manageable.  (AR 671.) Plaintiff reported that his irritability and depression had not improved.  (Id.)  Dr. Wilcox found that Plaintiff had a "[d]ysphoric mood and affect" but was alert and oriented with normal speech, good hygiene, goal-directed thoughts, and intact judgment and insight.  (Id.)  She diagnosed recurrent major depressive disorder, dysthymia, and mood disorder secondary to a general medical condition.  (Id.)

On December 7, 2009, Dr. Kashkouli noted that Plaintiff was "feeling well aside from depression" and had "lost weight over the course of the past several months which he attributes to depression."  (AR 661.)  On December 9, Dr. Kashkouli noted that Plaintiff's labs were within normal limits and advised Plaintiff to return for follow up in one year.  (AR 660.)

On February 11, 2010, Dr. Wilcox noted that Plaintiff "continues to be depressed, under a lot of stress, [and] very irritable," but had "good sleep."  (AR 658.)  Plaintiff reported that he had stopped taking gabapentin for a week and had not

26

noticed an increase in his pain.   (AR 658.)   Plaintiff also reported that he had not had any headaches since before Christmas. (AR 659.)   He described himself as being "intolerant to the injustices around us" and was "very irritable."   (AR 659.)

On April 29, 2010, Dr. Wilcox noted that Plaintiff reported that his irritability was "contained inside [him]."   (AR 656.) Plaintiff was distant from his wife and children and stayed home, spending his time watching television, reading the paper, and searching the internet for "injustices."   (<u>Id.</u>)   Plaintiff said that he had "great difficulty" interacting with people because he gets "extremely angry and distrusting"; his only support was his wife who was talking about a divorce.   (AR 656-57.)   Dr. Wilcox noted that Plaintiff had an irritable mood with restricted affect but was alert and oriented with normal speech, good hygiene and eye contact, goal-directed thoughts, and intact insight and judgment. (AR 657.)   Dr. Wilcox recommended that Plaintiff discontinue all of his psychiatric medications because "they have had no benefits" and informed Plaintiff that "he must make some behavioral changes if he would like to have a fulfilling life."[19]   (<u>Id.</u>)   She advised him to return to the clinic in three months.   (<u>Id.</u>)

\\

---

[19]   Specifically, Dr. Wilcox recommended that Plaintiff "read bible for not more than 2 hours"; avoid the internet unless his wife was there, so he would not "get on political/news/negative websites"; walk outside with his wife every day; watch no television except for funny movies, which he should try to watch every day; and "acknowledge when he gets up and before bed the gifts God has given and the blessings he has." (AR 657.)

On July 29, 2010, Dr. Wilcox noted that Plaintiff complained of middle insomnia with multiple awakenings, nightly nightmares, and depressed mood. (AR 744.) Plaintiff reported that his wife made sure he didn't watch the news and that he read the bible less than he used to. (Id.) Dr. Wilcox found that Plaintiff had a "depressed mood with mildly restricted affect" but was alert and oriented with normal speech, good hygiene and eye contact, goal-directed thoughts, and intact insight and judgment. (AR 745.) Dr. Wilcox agreed to continue one psychiatric medication at Plaintiff's request, noting that Plaintiff thought that it was "helping him to 'stay' in reality." (AR 744-45.) She recommended that he return to the clinic in two or three months. (Id.)

On August 31, 2010, Dr. Trompeter noted that Plaintiff reported a "feeling of itchiness" like "bugs crawling on him" and that his depression had worsened over the previous year and "continue[d] to dramatically affect his interpersonal relationships." (AR 741.) She noted that Plaintiff was "in the process of undergoing psychotherapy to try to unlock PTSD memories to subsequently deal with them and move on." (Id.)

Plaintiff also complained of "constant" left-elbow pain stemming from a "dislocation while on active duty." (AR 742.) Dr. Trompeter noted that Plaintiff weighed 229 pounds and had "difficulty" with his weight because he sat at home and ate all day long. (Id.) Dr. Trompeter noted that Plaintiff had an "exagerrated 'jumps off the table response'" when she touched his lumbar spine or right elbow. (AR 742.) Plaintiff's skin exam was

normal and Dr. Trompeter opined that his abnormal skin sensations were "a heightened sensitivity to his surroundings due to a medication effect, boredom, [or] primarily psychiatric illness." (AR 743.)   She was "uncertain that there is much chance for meaningful change in his depression/outlook and also relief of his chronic aches and pains if he continues to be medicated, homebound, and dependent on others." (Id.)   Dr. Trompeter recommended that Plaintiff get out more to improve his mood and enable weight loss, do yoga to help his back pain, use night splints and undergo physical therapy for elbow pain, and lose weight to help his knee pain.[20]   (AR 743.)   She recommended that he return to the clinic in one year.   (Id.)

On September 1, 2010, an x-ray of Plaintiff's right elbow showed possible olecranon bursitis. (AR 691.)   Plaintiff underwent physical therapy.   (AR 712-13.)

On November 3, 2010, Dr. Wilcox noted that Plaintiff reported that his medication was helping him "'stay' in reality." (AR 714.) Plaintiff said he was happy with his medication, his mood was good, and he was sleeping better. (Id.)   Dr. Wilcox found that Plaintiff did not need his medications changed and that he was alert and oriented, with normal speech rate and tone, good hygiene and eye contact, goal-directed thoughts, and intact insight and judgment. (Id.)

\\

---

[20]   Plaintiff's list of active medications did not include gabapentin or any other pain medication.   (See AR 742-43.)

She noted that Plaintiff had moved and advised him to follow up in three months at a clinic closer to his new home.[21]  (AR 714.)

## VI.  DISCUSSION

Plaintiff alleges that the ALJ erred in (1) evaluating Plaintiff's credibility; (2) assessing Plaintiff's mental impairments; (3) assessing the VA's disability rating decision; and (4) relying on the VE's testimony that Plaintiff could perform jobs that existed in sufficient numbers in the regional and national economy.[22]  (J. Stip. at 5.)

### A.   The ALJ Provided Clear And Convincing Reasons For Rejecting Plaintiff's Credibility

Plaintiff argues that the ALJ "failed to articulate legally sufficient reasons" for rejecting Plaintiff's testimony. (J. Stip. at 44.)  Because the ALJ provided clear and convincing reasons

---

[21]    The record contains additional treatment records that postdate the ALJ's November 22, 2010 decision, but as the Appeals Council noted (AR 98), they do not appear to be relevant to the period before the ALJ's decision, see 20 C.F.R. § 404.970(b) (Appeals Council "shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ] hearing decision"); compare Taylor, 659 F.3d at 1233 (treating physician's opinion "concerned his assessment of [claimant's] mental health since his alleged disability onset date" and therefore "related to" period before claimant's disability insurance coverage expired and before ALJ's decision (citing 20 C.F.R. § 404.970(b))).

[22]    The Court addresses the issues raised in the Joint Stipulation in an order different from that used by the parties, to avoid repetition and for other reasons.

supporting his evaluation of Plaintiff's testimony and those reasons were supported by substantial evidence in the record, reversal is not warranted on this basis.

### 1. Applicable law

An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight." See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Molina v. Astrue, 674 F.3d 1104, 1122 (9th Cir. 2012). In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d at 1035-36. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036 (internal quotation marks omitted). If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original). When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent affirmative evidence of malingering, those findings must provide "clear and convincing"

reasons for rejecting the claimant's testimony. Lester, 81 F.3d at 834. If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).

2.   Relevant facts

In an undated disability report, Plaintiff alleged that he could not work because of his major depression, posttraumatic stress disorder, kidney condition, back condition, and migraine headaches. (AR 211.) Plaintiff said that he had stopped working because his "[m]igraine headaches and back pain" caused him to miss a lot of work and "[t]ogether with [his] chronic major depression, Posttraumatic stress disorder, [he] did not want to hear or tolerate [his] supervisor's requests or suggestions." (Id.)

In an undated "disability report – appeal," Plaintiff wrote that his "chronic migraines" had not improved since his last report, he had undergone a kidney biopsy that was causing high blood pressure, and "only 50% of his kidney [was] functioning." (AR 220.) Plaintiff said he had been "feeling more depressed" since his last report and had "PTSD [from] serving in the military." (Id.)

At the hearing before the ALJ on June 11, 2010, Plaintiff testified that he received VA compensation for a service-connected disability at the 100% disabled rate, which was $3007 a month. (AR

32

40.)  Plaintiff testified that he was unable to work because his anger, anxiety, and "inability to cope with people." (AR 43.) Plaintiff said that his "physical problems," including his knee, left-elbow, and back conditions, also prevented him from working. (AR 43-44.)

Plaintiff testified that he "will not tolerate injustices," and may get "physical" if he needed to (AR 43), but he later admitted that he had not physically harmed anyone since his alleged disability onset date in June 2005. (AR 47-48.) Plaintiff also testified that he had stopped going to anger-management classes after he "threatened to physically do harm to another person there" and after that he "refused to continue on those classes." (AR 48.)

Plaintiff testified that his current weight was 220 and that he had stopped using his CPAP machine because he did not need it after his parathyroid was removed. (AR 44, 46-47.) Plaintiff testified that he drove three times a week, usually to take his children to and from two different schools, which took about 20 minutes each trip. (AR 49.) He had last driven on the highway one week earlier, when he took his wife to a store. (AR 50.) He cooked "easy" food like sandwiches and hot dogs, shopped for food with his wife, did the dishes twice a week, vacuumed once every two weeks, and paid the family's bills. (AR 50-51, 53-54.) His wife, who did not work, made the bed. (AR 42, 51.) She left the children home with Plaintiff about eight times a month for about an hour at a time. (AR 55.)
\\

Plaintiff testified that he did not have the "mental capacity" to help his daughter with her homework. (AR 52.) When the ALJ asked what Plaintiff did all day, Plaintiff said he slept and watched television. (AR 54.)

### 3. <u>Analysis</u>

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause only some of the alleged symptoms, and that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" Plaintiff's RFC for a limited range of sedentary, unskilled work with no close or frequent interpersonal contact with supervisors, co-workers, or the public. (AR 84-85.) These findings are supported by the record.

As an initial matter, the ALJ accommodated most of Plaintiff's subjective complaints by finding he was capable of only a limited range of sedentary work. (<u>See</u> AR 84.) For example, the ALJ accommodated Plaintiff's asserted "inability to cope with people" (AR 43) by limiting him to "unskilled work with no close or frequent interpersonal contact with supervisors, co-workers, or the public" (AR 84); <u>see also</u> SSR 85-15, 1985 WL 56857, at *4 (unskilled jobs "ordinarily involve dealing primarily with objects, rather than with data or people"). The ALJ also accommodated Plaintiff's reports of knee, left-elbow, and back pain (AR 43-44) by limiting him to standing and walking for only two hours a day,

with no pushing or pulling with the left arm, never kneeling or crawling, and only occasionally climbing ramps or stairs, among other things (AR 84). Indeed, Plaintiff acknowledges that the ALJ "credited the vast majority of [his] complaints of physical pain and limitation." (J. Stip. at 38.)

To the extent the ALJ rejected Plaintiff's subjective complaints, however, he provided clear and convincing reasons for doing so. First, the ALJ correctly noted that Plaintiff's testimony and other statements contained inconsistencies. (AR 86, 89-90.) At the hearing before the ALJ, Plaintiff testified that he was angry and anxious and would get "physical" with people, but he later admitted that he had never actually physically harmed anyone (AR 86; AR 43, 47-48).[23] Moreover, in August 2009, Dr. Wilcox noted that Plaintiff presented with a "[d]ysphoric mood and affect" and reported that his pain was "increasing" and he was controlling his "intense anger toward everything." (AR 479.) Later that same month, however, Dr. Trompeter recorded a very different picture, noting that Plaintiff reported that he had enjoyed a "great summer" with his five children, "moved into a new home with a pool and ha[d] been swimming since May," and lost 20 pounds, bringing his

\\

\\

---

[23]   After Plaintiff testified that he would get "physical" with people if necessary, the ALJ asked, "since June 2005, have you physically harmed anyone in any way?" (AR 47.) Plaintiff answered, "Yes." (Id.) The ALJ asked, "Who did you harm physically?" (Id.) Plaintiff responded, "I'm sorry, not physically," and "[m]entally, I have, but not physically." (AR 47-48.)

weight down to 229.[24]  (AR 473.)  Plaintiff also made inconsistent statements about the reason for his weight fluctuations, telling Dr. Trompeter in August 2009 that his weight loss had been "due to better dietary choices" (AR 473), then telling Dr. Kashkouli in December 2009 that he had a "poor appetite" and had "lost weight over the course of the past several months" because of "depression" (AR 661).  In August 2010, moreover, Plaintiff still weighed 229 pounds but reported to Dr. Trompeter that he had had "difficulty with his weight because he sits at home and eats all day long."[25] (AR 742.)  Those conflicts in Plaintiff's statements were permissible reasons for discounting his credibility.  See Smolen, 80 F.3d at 1284 (in determining credibility, ALJ may consider "ordinary techniques of credibility evaluation," such as claimant's prior inconsistent statements concerning symptoms); Thomas, 278 F.3d at 958-59 (in determining credibility, ALJ may consider inconsistencies in claimant's testimony); Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ permissibly discounted credibility based on contradictions within claimaint's testimony).

\\

\\

---

[24]  It appears that Plaintiff had actually lost about 30 pounds by August 2009.  (See AR 473; AR 395 (259 pounds on May 27, 2008); AR 333 (256 pounds on Sept. 8, 2008); AR 384 (255 pounds on Dec. 19, 2008).

[25]  Plaintiff submitted Dr. Trompeter's August 2010 note, along with several other medical records, to the Appeals Council after the ALJ issued his written decision.  (See AR 101, 727.) Because the Appeals Council considered that evidence and made it part of the administrative record (AR 97-101), the Court reviews it in determining whether the ALJ's decision is supported by substantial evidence, Brewes, 682 F.3d at 1163.

The ALJ also permissibly found that Plaintiff's daily activities were inconsistent with his claim of total disability. (AR 87.) See Thomas, 278 F.3d at 958-59 (in assessing credibility, ALJ may consider inconsistencies either in claimant's testimony or between testimony and conduct); cf. Molina, 674 F.3d at 1113 ("Even where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."). Plaintiff testified that he drove regularly, taking his children to school and his wife shopping; prepared simple meals; went grocery shopping with his wife; washed dishes twice a week; vacuumed every two weeks; paid bills using a checkbook; and occasionally took care of his children on his own. (AR 87; AR 49-51, 55.) Plaintiff reported having five children. (AR 341). Similarly, Plaintiff reported to Dr. Soliman that he was able to cook, clean, shop, run errands, take care of his personal hygiene and financial responsibilities, drive a car, focus on daily activities, and get along well with family, friends, and neighbors. (AR 341.) As the ALJ found, those activities indicate that Plaintiff was "not so debilitated as he claim[ed]." (AR 87.)

The ALJ was also permitted to discount Plaintiff's claims of debilitating pain because they conflicted with the medical evidence showing that his pain was treated conservatively and that he was "clearly physically able to work." (AR 86); see Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Tommasetti v.

1  Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (ALJ may infer that

2  claimant's "response to conservative treatment undermines

3  [claimant's] reports regarding the disabling nature of his pain");

4  Lingenfelter, 504 F.3d at 1040 (in determining credibility, ALJ may

5  consider "whether the alleged symptoms are consistent with the

6  medical evidence"); see also Burch v. Barnhart, 400 F.3d 676, 681

7  (9th Cir. 2005) ("Although lack of medical evidence cannot form the

8  sole basis for discounting pain testimony, it is a factor that the

9  ALJ can consider in his credibility analysis."). As the ALJ found,

10 Plaintiff's "analgesic medication history [was] inconsistent with

11 his claimed severity of pain." (AR 87.) Indeed, Plaintiff claimed

12 to have debilitating back, knee, and elbow pain, but his doctors

13 generally recommended only that he take acetaminophen or

14 acetaminophen with codeine, exercise, or lose weight. (See AR 384

15 (recommending acetaminophen with codeine and exercise); AR 398

16 (recommending acetaminophen with codeine); AR 566 (recommending

17 acetaminophen); AR 580 (recommending acetaminophen); AR 586

18 (recommending acetaminophen); AR 743 (recommending yoga and weight

19 loss).) Plaintiff also briefly took gabapentin (AR 743-44) but he

20 discontinued it without any increase in pain (AR 658). Moreover,

21 in August 2010, Dr. Trompeter, Plaintiff's primary-care physician,

22 indicated that Plaintiff was exaggerating his pain symptoms, noting

23 that he had an "exaggerated 'jumps off the table response'" when

24 she touched his lumbar spine and right elbow.[26]   (AR 742);

25

26

27  [26]   This note was also part of the records that Plaintiff
    submitted the Appeals Council after the ALJ rendered his
28  decision, and it constitutes further substantial evidence in
    support of the ALJ's decision. See Brewes, 682 F.3d at 1163.

Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001) (credibility determination based on, among other things, plaintiff's "tendency to exaggerate" proper when supported by "substantial evidence").   As the ALJ noted (AR 83, 86), Dr. Trompeter clearly believed that Plaintiff's physical problems did not prevent him from working, recommending that he "return to work as soon as psychiatry can clear." (AR 386.)

Finally, the ALJ found that Plaintiff's "demeanor as a witness at [the] hearing was very poor." As an ALJ's personal observations can support an adverse credibility determination, see Thomas, 278 F.3d at 960 (ALJ properly relied on claimant's "demeanor at the hearing" in rejecting her credibility), and as there were numerous alternative convincing reasons to reject Plaintiff's testimony, no remand is required.   As the reasons were supported by substantial evidence, this Court "may not engage in second-guessing." Thomas, 278 F.3d at 959 (citation omitted).

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

B.   <u>The ALJ Properly Evaluated Plaintiff's Mental</u>
<u>Impairments</u>

Plaintiff contends that the ALJ erred in rejecting Dr. Wilcox's August 7, 2008 opinion that Plaintiff was unable to obtain and maintain employment.  (J. Stip. at 28-35.)

1.   <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (non-examining physicians)." <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.  <u>Id.</u>

The opinions of treating physicians are generally afforded more weight than the opinions of nontreating physicians because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  <u>Smolen</u>, 80 F.3d at 1285.  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  20 C.F.R.

§ 404.1527(c)(2).  If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  Id. § 404.1527(c)(2)-(6).

When a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  Carmickle, 533 F.3d at 1164 (quoting Lester, 81 F.3d at 830-31).  When a treating physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting it.  Id.  Further, the ALJ need not accept any medical opinion that conflicts with the physician's own treatment notes or the record as a whole.  See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (holding that discrepancy between physician's notes and his assessment of limitations was "clear and convincing" reason for rejecting opinion); Connett v. Barnhart, 340 F.3d 871, 874-75 (9th Cir. 2003) (affirming ALJ's rejection of physician's RFC questionnaire because it was "not supported by his own notes" and "had multiple inconsistencies with all other evaluations" (alteration omitted)).

## 2.  Relevant facts

On August 7, 2008, Dr. Wilcox wrote a letter stating that Plaintiff was compliant with his treatment but it had been "difficult to get his illness stabilized with a medication regimen

41

and therefore he continues to be quite depressed." (AR 315.)  She listed Plaintiff's symptoms as depressed mood, isolation, irritability, insomnia, decreased daytime energy, poor short-term memory, poor attention span, decreased concentration, passive thoughts of death, and decreased motivation. (Id.)  Dr. Wilcox opined that, "[b]ecause of this, in no way is he able to obtain or maintain gainful employment." (Id.)

### 3.   Analysis

The ALJ permissibly accorded "little weight" to Dr. Wilcox's opinion that Plaintiff was unable to obtain or maintain gainful employment. (AR 88.)  First, the ALJ noted Dr. Wilcox "made no assessment of what [Plaintiff] can still do despite his impairments" and instead concluded only that Plaintiff was unable to obtain or maintain employment, which was "an issue reserved to the Commissioner." (AR 89.)  It is true that a treating physician's statement on an issue reserved to the Commissioner, such as the determination of a claimant's ultimate disability, is not binding on the ALJ or entitled to special weight.  20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); SSR 96-5p, 1996 WL 374183, at *5 (treating-source opinions that a person is disabled or unable to work "can never be entitled to controlling weight or given special significance"); see also McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011) ("A disability is an administrative determination of how an impairment, in relation to education, age, technological,

economic, and social factors, affects ability to engage in gainful activity."). Thus, the ALJ was not obligated to accept it.

The ALJ also properly discounted Dr. Wilcox's opinion because her finding of "multiple aspects of cognitive impairment by way of 'poor short-term memory, poor attention span, and decreased concentration'" was "not supported by the medical record including [her] own treating notes."[27] (AR 89); see Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 692-93 (9th Cir. 2009) (contradiction between treating physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting treating physician's opinion); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) ("an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings"); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ permissibly rejected treating physician's opinion when opinion was contradicted by or inconsistent with treatment reports). Although Plaintiff reported decreased short-term memory and concentration when Dr. Wilcox first evaluated him (AR 572), Dr. Wilcox did not thereafter note any cognitive problems and instead consistently found that Plaintiff was "alert and oriented" with normal speech, goal-directed thoughts, and intact insight and judgment (see, e.g.,

---

[27]In Dr. Wilcox's notes, she reported Plaintiff as stating: "He said that once he got 100% disability he hasn't been able to work and therefore cannot provide for his family. His wife has never worked. Both he and his wife say that he has noticed a definite benefit from the mediccontinuation. He is still tired during the day, often takes a nap." (AR 393.)

AR 387, 392-93, 402, 407, 479, 481-82, 484-86, 567, 572, 657, 659, 671, 714, 745). Dr. Soliman, moreover, examined Plaintiff on September 2, 2008, less than one month after Dr. Wilcox rendered her opinion, and found that Plaintiff was able to recall three out of three objects after five minutes and perform serial sevens without error; had intact memory, normal abstract thinking, and good insight; and reported that he was able to focus on his daily activities. (AR 341-42.) Those findings conflict with Dr. Wilcox's finding that Plaintiff had poor memory, attention, and concentration. The ALJ was entitled to reject Dr. Wilcox's opinion on this basis.[28]

The ALJ therefore did not err in rejecting Dr. Wilcox's opinion that Plaintiff was unable to work. Remand is not warranted on this ground.

---

[28] Plaintiff contends that the findings of psychiatrist Kristin S. Beizai "confirm the reasonableness of Dr. Wilcox's assessments and observations." (J. Stip. at 34.) Dr. Beizai's findings do not appear to be relevant to the time period on or before the ALJ's decision, however, because her first evaluation of Plaintiff was not until December 14, 2010, nearly a month after the ALJ issued his decision in November 2010, and nothing indicates that it related to the period before that. (See AR 705-08); 20 C.F.R. § 404.970(b). In any event, Dr. Beizai's findings fail to corroborate Dr. Wilcox's opinion that Plaintiff was totally disabled. At the December 2010 evaluation, Plaintiff reported that he was depressed and isolating himself, among other symptoms; had been seeing a psychologist for three or four months, which had been "very helpful"; and was "doing better" on his current medication, with improved sleep and fewer nightmares. (AR 705-06.) Dr. Beizai found that Plaintiff had a "down" mood and was irritable "at points" but was cooperative with a linear thought process; had no psychosis, suicidal ideations, delusions, or impulsivity; and had good judgment and insight. (AR 707.) Those findings fail to corroborate Dr. Wilcox's finding that Plaintiff was totally disabled.

C. **The ALJ Permissibly Discounted Plaintiff's VA Rating Decision**

Plaintiff argues that the ALJ should have accorded more weight to the VA's conclusion that Plaintiff was disabled. (J. Stip. at 6-11.)

1. Applicable law

An ALJ must "ordinarily give great weight to a VA determination of disability." McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002). "While a VA disability decision does not necessarily compel the SSA to reach an identical result, the ALJ must consider the VA's finding in reaching his decision, because of the similarities between the VA disability program and the Social Security disability program." Hiler v. Astrue, 687 F.3d 1208, 1211 (9th Cir. 2012) (internal quotation marks, alteration, and citation omitted). But because the two federal programs are not identical, "the ALJ may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." McCartey, 298 F.3d at 1076; accord Valentine, 574 F.3d at 695.

2. Relevant facts

On August 20, 2007, the VA found that Plaintiff was entitled to "individual unemployability" effective November 15, 2005. (AR 599.)  After summarizing the medical evidence, including Dr.

45

Martindill's August 2007 examination report, the VA noted that Plaintiff's "combination of [] service connected disabilities (predominately [] depression) has been shown to significantly impact [his] ability to retain gainful employment." (AR 602.)  The VA noted that its determination was "not final" and was "subject to future reduction based on further evaluation and substantial improvement of [his] service connected conditions with necessary treatment."  (AR 602-03.)  At that time, Plaintiff was rated 80 percent disabled, which apparently included a 50-percent disability rating for major depression with dysthymia, a 30-percent disability rating for "cluster migraine headaches," and 30-percent disability rating for "hypertension associated with glomerulonephritis."[29] (AR 247 (Nov. 5, 2008 VA rating decision "continu[ing]" Plaintiff's disability ratings), 596 (VA letter stating that Plaintiff's "overall or combined rating is 80% although we are paying you at the 100% rate for Individual Unemployability").)

On November 22, 2010, the ALJ denied Plaintiff's claim for Social Security DIB.  (AR 78-93.)  In doing so, the ALJ gave "considerable weight" to Dr. Martindill's "implied opinion that [Plaintiff was] not mentally debilitated," which the ALJ found was "implicit in his refusal to endorse qualification for VA rating of 'individual unemployability.'"  (AR 90.)  The ALJ also considered Plaintiff's VA rating decision but concluded that it "did not

---

[29]    "Glomerulonephritis is a type of kidney disease in which the part of your kidneys that helps filter waste and fluids from the blood is damaged." Glomerulonephritis, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000484.htm (last updated Mar. 22, 2013).

1  change [his] independent assessment of the entire record in this

2  case." (AR 90-91.)  First, the ALJ noted that the VA awarded

3  Plaintiff "individual unemployability" "on the unelaborated ground

4  of resolving reasonable doubt in [Plaintiff's] favor." (AR 90.)

5  Second, the ALJ found that "a 100% VA disability rating certainly

6  does not preclude full-time work at the level of substantial

7  gainful activity." (AR 90.)  Third, the ALJ noted that

8

9      the VA's definition of "unemployability" is importantly

10     different than the definition of "disability" under the

11     Social Security Act.  Under VA regulations, "A veteran

12     may be considered as unemployable . . . when it is

13     satisfactorily shown that he or she is unable to secure

14     further employment." (38 C.F.R. § 4.18).  Obviously,

15     veterans may be "unable to secure further employment"

16     simply because no one will hire them.  However, the

17     Social Security Act specifically forbids consideration of

18     that fact in determining disability under the act (Social

19     Security Act §§ 223(d)(2)(A), 1614(a)(3)(B); 42 U.S.C. §§

20     423(d)(2)(A), 1382(a)(3)(B)).

21

22  (AR 90-91.)  Finally, the ALJ noted that he had "independently

23  addressed and assessed" the "evidentiary basis" for the VA's

24  decision and found that it did not show that Plaintiff was

25  disabled.  (AR 90-91.)

26  \\

27  \\

28  \\

1          3.   <u>Discussion</u>

2

3       The ALJ provided reasons for according little weight to the VA
4  decision that are persuasive, specific, valid.  <u>See</u> McCartey, 298
5  F.3d at 1076.  Plaintiff therefore is not entitled to reversal on
6  this ground.

7

8       First, the ALJ indicated that he had "independently addressed
9  and assessed" the "evidentiary basis" for the VA's decision and
10 found that it did not support a finding of disability.  (AR 91.)
11 Indeed,  the  VA  decision  appears  to  rest,  in  part,  on  Dr.
12 Martindill's opinion (<u>see</u> AR 602), but the ALJ correctly noted that
13 Dr. Martindill "refus[ed] to endorse qualification for VA rating of
14 'individual  unemployability'"  and  "opined  that  with  treatment
15 [Plaintiff] could likely work."  (AR 90); 20 C.F.R. § 404.1530(a)-
16 (b) (stating that benefits will be denied to a claimant who fails
17 to follow treatment that can restore his ability to work).  Indeed,
18 Dr.  Martindill's  findings  during  the  mental  examination  were
19 relatively  benign:  Plaintiff  had  slow  mentation  but  was
20 "cognitively intact," had an average IQ, "did well on naming
21 presidents  backwards"  and  "adequately  on  serial  7's,"  had  a
22 depressed  mood  but  was  "not  psychotic,"  and  did  not  have  an
23 "impulse  problem."  (AR 381.)  Dr. Martindill also noted that
24 Plaintiff  put  "little  effort"  into  the  exam,  thereby  indicating
25 that Plaintiff's symptoms may have been exaggerated.  (AR 381.)
26 Dr.  Martindill  concluded  that  he  could  not  "recommend
27 unemployability status," noting that Plaintiff was "not psychotic,"
28 had  never  been  hospitalized,  and  had  a  history  of  "good  work

48

performance." (AR 383.) Dr. Martindill also noted that Plaintiff had not seen a psychiatrist for "quite a long time" and opined that Plaintiff would likely be able to work if he received "more aggressive treatment and closer monitoring" and possibly group therapy, anger management, and different medication. (AR 381, 383.) Moreover, the VA's decision also apparently rested, in part, on the fact that Plaintiff was rated 30 percent disabled for migraine headaches and 30 percent disabled for hypertension[30], but the ALJ correctly found that Plaintiff suffered only "infrequent" migraines and his hypertension was "controlled on medication." (AR 80, 82; see, e.g., AR 398 (hypertension "well controlled"); AR 474 (hypertension in "good control"); AR 565 (noting blood pressure was high that day but "well controlled at home"); AR 585 (noting "controlled" hypertension); AR 659 (Feb. 2010, Plaintiff reported he had not had headache since before Christmas).) Indeed, Plaintiff does not challenge the ALJ's findings regarding his migraine headaches and hypertension. Thus, the ALJ's reliance on his own independent assessment of the "evidentiary basis" of the VA's opinion was a proper reason for rejecting it. See Valentine,

---

[30]     VA regulations provide that a veteran usually must meet certain rating criteria in order to be awarded individual unemployability. 38 C.F.R. § 4.16(a) (stating, in relevant part, that "if there are two or more disabilities, there shall be at least one disability ratable at 40 percent or more, and sufficient additional disability to bring the combined rating to 70 percent or more"). Plaintiff appears to have met those criteria because he was rated 50 percent disabled because of his depression, 30 percent disabled because of hypertension, and 30 percent disabled because of migraine headaches. (See AR 596 (noting that Plaintiff's "overall or combined rating is 80%"); AR 245 (noting that Plaintiff's depression was rated 50 percent disabling, his hypertension 30 percent disabling, and his migraine headaches 30 percent disabling).)

574 F.3d at 695 (finding that "the acquisition of new evidence or a properly justified reevaluation of old evidence constitutes a persuasive, specific, and valid reason supported by the record . . . for according little weight to a VA disability rating" (internal quotation marks and alterations omitted)).

Second, the ALJ noted that the VA awarded Plaintiff "individual unemployability" status "on the unelaborated ground of resolving reasonable doubt in his favor." (AR 90.) Indeed, in its decision, the VA simply summarized the medical evidence, including Dr. Martindill's report, and acknowledged that "reasonable doubt" existed regarding Plaintiff's employability. (AR 602.) As required by VA regulations, the VA resolved that doubt in Plaintiff's favor and granted entitlement to individual unemployability. (AR 602); 38 C.F.R. § 4.3 ("When after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding the degree of disability such doubt will be resolved in favor of the claimant."). Here, however, the ALJ was under no such obligation.

\\
\\
\\
\\
\\
\\
\\
\\
\\

Indeed, even if the medical evidence could reasonably be interpreted differently — which the VA decision appears to acknowledge — this Court must "uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation."[31] Magallanes v. Bowen, 881 F2d 747, 750 (9th Cir. 1989); accord Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007).

This Court does acknowledge disagreement with some of the ALJ's reasons for discounting the VA rating decision.  The ALJ did erroneously conclude that the VA's definition of "unemployable" conflicted with the Social Security Act's definition.  (AR 90-91.) The VA regulation governing "[t]otal disability ratings for compensation based on unemployability of the individual," which was the relevant regulation in Plaintiff's claim for VA individual unemployability benefits, provides that "[t]otal disability ratings for compensation may be assigned, where the schedular rating is less than total, when the disabled person is, in the judgment of the rating agency, *unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities*." 38 C.F.R. 4.16(a) (emphasis added).  Contrary to the ALJ's findings, that standard appears largely consistent with the Social

---

[31]     Plaintiff contends that "the ALJ parsed out of the opinions of Dr. Martindill the sociological concern of placing a relatively young man on the disability rolls" and "ignor[ed] the finding of a depressed level of function that permitted if not required the VA rating on depression."  (J. Stip. at 11.)  The ALJ, however, credited Dr. Martindill's opinion (AR 90) and concluded that Plaintiff's depression was a severe impairment and limited him to unskilled work with no close or frequent interpersonal contact with supervisors, coworkers, or the public (AR 80, 84).

Security Act's definition of "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Second, the ALJ erroneously found that "a 100% VA disability rating certainly does not preclude full-time work at the level of substantial gainful activity," implying that Plaintiff received a 100% VA disability rating, which is incorrect. (AR 90.)  It is also true that the VA's percentage ratings are based on an "average impairment in earning capacity" resulting from various impairments, as opposed to an individualized determination that the particular veteran is unable to work.  See 38 C.F.R. § 4.1 ("The percentage ratings represent as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations.").  Here, Plaintiff was found to be less than 100% disabled under the percentage ratings but was nonetheless awarded "individual unemployability" based on the VA's finding that he was likely "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities."  38 C.F.R. § 4.16(a).  As discussed, that individualized determination is substantially similar to the Social Security Administration's own disability standard.  Those errors, however, are harmless because the ALJ's rejection of the VA rating decision was supported by other persuasive, specific, and valid reasons.  See Valentine, 574 F.3d at 695 (finding ALJ justified in rejecting VA disability rating even though only one of two offered reasons was proper); see

52

also Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (ALJ's error harmless when "inconsequential to the ultimate nondisability determination").   As the ALJ's decision remains legally valid despite these errors, no remand is required.

### D.   The ALJ Properly Relied on the VE's Testimony

Plaintiff contends that the ALJ erred by relying on the VE's testimony regarding the number of jobs available to Plaintiff in the local and national economy because two sources, Job Browser Pro and Specific Occupation Employment Unskilled Quarterly, "alter[s] the landscape of the evidence about the number of jobs" available to Plaintiff.   (J. Stip. at 60.)

### 1.   Applicable law

At step five of the five-step process, the Commissioner has the burden to demonstrate that the claimant can perform some work that exists in "significant numbers" in the national or regional economy, taking into account the claimant's RFC, age, education, and work experience.   Lounsbury v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006); 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c). The Commissioner may satisfy that burden either through the testimony of a VE or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2. Lounsbury, 468 F.3d at 1114.

\\

When the services of a VE are used at step five, an ALJ may call upon the VE to testify as to "(1) what jobs the claimant, given his or her [RFC], would be able to do; and (2) the availability of such jobs in the national economy." <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1101 (9th Cir. 1999).  In doing so, an ALJ "poses hypothetical questions to the [VE] that set out all of the claimant's impairments for the [VE's] consideration." <u>Id.</u> (citation and internal quotation marks omitted).  When a hypothetical includes "all of the limitations that the ALJ found credible and supported by substantial evidence in the record," then the ALJ may properly rely on the VE's response. <u>Bayliss</u>, 427 F.3d at 1217-18.  A VE's "recognized expertise provides the necessary foundation for his or her testimony." <u>Id.</u> at 1218.  The Federal Rules of Evidence do not apply to the admission of evidence in Social Security administrative proceedings. <u>Id.</u> at 1218 n. 4.  No additional foundation is required. <u>Id.</u>

### 2.   Relevant facts

At the administrative hearing, the ALJ solicited the testimony of VE John Kilcher, who Plaintiff stipulated was qualified to provide expert testimony. (AR 60.)  After the VE testified that he had "studied the exhibits and heard [Plaintiff's] testimony about his work history," the ALJ asked him whether full-time work existed for a person with Plaintiff's physical and mental limitations (AR 62-63).  The VE testified that such person could perform assembler jobs, an example of which would be "final assembler," DOT 713.687-018, 1991 WL 679271; production-inspector jobs, an example

of which would be table worker, DOT 739.687-182, 1991 WL 680217;[32] and administrative-support jobs, and example of which would be "document preparer," DOT 249.587-018, 1991 WL 672349.  (AR 63-64.) The VE testified that about 600 final-assembler jobs existed regionally and 230,000 existed nationally, 300 table-worker jobs existed regionally and 150,000 existed nationally, and 400 document-preparer jobs existed regionally and 175,000 existed nationally.  (AR 64.)  Plaintiff's counsel cross-examined the VE but did <u>not</u> question him regarding the number of available jobs or his basis for making that determination.  (AR 64-68.)  Arguably, Plaintiff's counsel's failure to question the VE about the number of available jobs waived this issue for further review.  See <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1115 (9th Cir. 1999).  Had it been raised before the ALJ, the ALJ would have had the opportunity to explore and address the issue and its supporting evidence in the manner contemplated by the regulatory scheme.

After the ALJ issued his written decision finding Plaintiff not disabled, Plaintiff retained new counsel and asked the Appeals Council to review the ALJ's decision.  (AR 257-91.)  In his brief in support of his request for review, Plaintiff argued that the ALJ erroneously relied on the VE's testimony regarding the number of jobs existing in the regional and national economies because "[a]ccording to two published resources, these numbers are

---

[32]    The hearing transcript and the ALJ refer to this job as "cable worker" (AR 64, 92), but this appears to be a transcription error because the relevant DOT job description is for "table worker," DOT 739.687-182, 1991 WL 680217.

unreliable and should suffer summary rejection." (AR 258.) First, Plaintiff asserted that the Specific Occupation Employment Unskilled Quarterly stated that one final-assembler job existed regionally and 64 existed nationally, 33 table-worker jobs existed regionally and 3,703 existed nationally, and 35 document-preparer jobs existed regionally and 3,335 existed nationally. (AR 258-58.) Second, Plaintiff asserted that Job Browser Pro stated that one final-assembler job existed statewide and 15 existed nationally, 26 table-worker jobs existed regionally and 2,571 existed nationally, and 689 document-preparer jobs existed regionally and 63,832 existed nationally. (AR 259.) Plaintiff further asserted that, according to Job Browser Pro, only 90 percent of the table-worker jobs and 70.3 percent of the document-preparer jobs were full-time positions. (Id.) Plaintiff attached to his brief three pages of a spread sheet entitled Specific Occupation Employment Unskilled Quarterly and three unidentified computer print-outs, presumably from Job Browser Pro. (See AR 260-91.)

The Appeals Council received Plaintiff's brief and attached documents and included them in the record. (AR 97-102.) The Council, however, found that the information submitted did not provide a basis for changing the ALJ's decision and denied Plaintiff's request for review. (AR 97-102.)

3.   Analysis

Plaintiff contends that the Specific Occupation Employment Unskilled Quarterly "is a data source that [VEs] rely upon as a

matter of custom" and that <u>Job Browser Pro</u> is "a tool used by [VEs] in the divination of the number of jobs in the economy." (J. Stip. at 55-56.)   Those sources, Plaintiff argues, estimate that the "size of the occupational bases is substantially smaller" than the VE testified.   (J. Stip. at 60.)   Thus, Plaintiff argues, "no reasonable person would accept the testimony of the [VE] given in this case about the number of jobs."   (<u>Id.</u>)

Plaintiff's argument fails because his lay assessment of the data derived from the <u>Specific Occupation Employment Unskilled Quarterly</u> and <u>Job Browser Pro</u> does not undermine the reliability of the VE's testimony.   Plaintiff failed to introduce any VE opinion interpreting the data from those sources and the significance of the information reflected on the various reports is not entirely clear.[33]   Indeed, neither of the cited reports are included in the Social Security regulations' list of authoritative sources.   <u>See</u> 20 C.F.R. § 404.1566(d) (ALJ will take administrative notice of "reliable job information" in certain publications).[34]   Although

---

[33]   For example, the <u>Job Browser Pro</u> report for the document-preparer job lists "group numbers" that show 30,100 jobs regionally and 2,789,590 nationally; "unweighted cumulative estimated adjusted employment numbers" that show 2,206 jobs regionally and 204,449 jobs nationally; and a "weighted DOT estimate," upon which Plaintiff relies, that shows 609 jobs regionally and 63,832 jobs nationally.   (AR 287.)

[34]   The regulation specifically lists the following publications as sources of reliable job information: (1) Dictionary of Occupational Titles, published by the Department of Labor; (2) County Business Patterns, published by the Bureau of the Census; (3) Census Reports, also published by the Bureau of the Census; (4) Occupational Analyses, prepared for the Social Security Administration by various State employment agencies; and (5) Occupational Outlook Handbook, published by the Bureau of

Plaintiff cites several decisions that generally acknowledge the reliability of the data generated by programs such as Job Browser Pro (J. Stip. at 56-57), none of these decisions find that such information, submitted for the first time to the Appeals Council, is sufficient grounds for finding that the ALJ's reliance on VE testimony lacked substantial evidence. To the contrary, those decisions actually suggest that the VE should rely on his or her professional expertise rather than adopting wholesale the data from any one source such as Job Browser Pro.[35] Indeed, Plaintiff's argument has been rejected by several Courts in this district. See, e.g., Solano v. Colvin, No. SA CV 12-01047 RZ, 2013 WL

---

Labor Statistics.

[35] See, e.g., Poisson v. Astrue, No. 2:11-cv-245-NT, 2012 WL 1067661, at *9 (D. Me. Mar. 28, 2012) (finding that VE's reliance on Job Browser Pro was not error because she "relied on her professional experience and expertise, and not strictly on a software program, in endorsing the numbers provided to the [ALJ]."), accepted by 2012 WL 1416669 (D. Me. Apr. 24, 2012); Cole v. Astrue, Civ. No. 10-510-CL, 2011 WL 5358557, at *26 (D. Or. June 7, 2011) (VE permissibly relied in part on job numbers generated by "Skill Trend by Job Browser"), accepted by 2011 WL 5358550 (D. Or. Nov. 4, 2011); Pitts v. Astrue, No. 1:10-CV-870, 2011 WL 2553340, *6 (N.D. Ohio May 19, 2011) (ALJ permissibly relied on VE testimony regarding number of jobs despite possible inconsistency with information from Job Browser Pro because VE's "job incidence figures were based on several sources of information," among other things), accepted by 2011 WL 2553311 (N.D. Ohio June 28, 2011); Drossman v. Astrue, 2011 WL 4496568, *7-8 (N.D. Ohio July 15, 2011) (ALJ properly relied on VE's opinion, even though it could conflict with information from Job Browser Pro, because "[a]lthough the VE confirmed that the Job Browser Pro program was a valid source of information on which he relied, the VE also indicated that he relied upon other sources of information" and "explained that Plaintiff's counsel was misinterpreting the statistical information listed in the Job Browser Pro program"), accepted by 2011 WL 4496561 (N.D. Ohio Sept. 27, 2011).

3776333, at *1 (C.D. Cal. July 16, 2013) ("The Appeals Council certainly was entitled to rely on the vocational expert's testimony, even in the face of the page from Job Browser Pro, in making its determination."); Villareal v. Colvin, No. EDCV 12-01640-JEM, 2013 WL 3071259, at *6 (C.D. Cal. June 18, 2013) ("There is no reason to believe that the Job Browser Pro data is the only source of job data or superior to others, and thus such data is not conclusive."); see also Valenzuela v. Colvin, No. CV 12-0754-MAN, 2013 WL 2285232, at *4 n.4 (C.D. Cal. May 23, 2013) (collecting cases).

Moreover, the VE was not obligated to explain his methodology for determining the number of available jobs because his professional expertise, which Plaintiff specifically acknowledged and did not challenge at the hearing (AR 60), was a sufficient foundation for his testimony. See Bayliss, 427 F.3d at 1218; see also 20 C.F.R. § 404.1566(e) (ALJs may use VE to determine occupational issues). At the hearing, moreover, neither Plaintiff nor his counsel challenged the VE's job numbers, inquired about his methodology for generating those numbers, solicited his opinion regarding the validity of the information in the Job Browser Pro or Specific Occupation Employment Unskilled Quarterly, or presented any reports or other evidence regarding the availability of jobs. (See AR 60-68.) Instead, Plaintiff waited until after the ALJ's adverse decision to submit the alternative jobs data to the Appeals Council. As such, at the hearing, the VE had no reason to explain the basis of his opinion or address the validity of the two job-data sources.

Finally, Plaintiff argues that the VE "engaged in aggregation error" because in calculating the number of jobs existing in the regional and national economies, he improperly counted jobs that exceeded Plaintiff's limitations. (J. Stip. at 59). Plaintiff asserts that the job numbers that the VE provided at the hearing were improperly based on broad job categories rather than the individual occupations that Plaintiff could perform. To support his argument, Plaintiff relies on the Second Circuit's decision in Brault v. Soc. Sec. Admin., 683 F.3d 443, 446 (2d Cir. 2012), which, while affirming the ALJ's reliance on the VE's testimony, also explained that because the DOT only defines jobs, vocational experts rely on other tools to determine whether jobs exist for particular DOT occupations. (J. Stip. at 57-58). However, these tools do not compile data for each DOT job code individually; rather, they calculate the number of jobs in particular job groupings, which encompass many individual DOT occupations. Brault, 683 F.3d at 446. The Second Circuit noted that because DOT codes "are much more granular" than job groupings, it is possible that VE calculations based on the groupings will include jobs that a claimant is not fit to perform. Id.

> If, for example, ten DOT codes map to a single [job grouping] code, saying there are 100,000 total positions available in that [grouping] code gives no information at all about how many positions each of the ten DOT codes contributed to that total. This becomes a problem if DOT titles with different exertion or skill levels map to the same [grouping] code. In such a situation . . . a rough

weighted algorithm [is used] — if ten DOT codes correspond to one [grouping] code, and four of those codes are light-duty, unskilled positions, then the [grouping] code will list 40% of the positions available . . . as light-duty, unskilled positions. That estimate may deviate significantly from the actual number of existing positions."

Id. at 447 n.4. Unlike the current case, the plaintiff in Brault raised these concerns to the ALJ. Even so, the ALJ relied upon the VE's testimony and the Second Circuit ultimately upheld that decision. Id. at 451.

Plaintiff argues that data from Job Browser Pro indicate that the VE committed this type of "aggregation error" and overestimated the number of existing jobs that Plaintiff could perform. The VE testified that about 600 final-assembler jobs existed regionally and 230,000 existed nationally, 300 table-worker jobs existed regionally and 150,000 existed nationally, and 400 document-preparer jobs existed regionally and 175,000 existed nationally. (AR 63-64).) According to the Job Browser Pro data that Plaintiff introduced, the job "final-assembler" corresponds to grouping code 51-9399, which encompasses over 1,500 distinct occupations and represented a total of 1,310 jobs regionally and 229,240 nationwide. (J. Stip. 58) The job "table-worker" corresponds to grouping code 51-9061, which encompasses 782 distinct occupations and represented a total of 4,230 jobs regionally and 410,750 nationwide. (Id. at 59) The job "document-preparer" corresponds

61

to grouping code 43-9061, which encompasses 72 distinct occupations and represented 30,100 jobs in the region and 2,789,590 jobs nationwide.   (Id. at 59)   Plaintiff argues that these numbers "rob[] the testimony of the [VE] of classification as 'substantial' evidence[]" because they indicate "aggregation error."   (Id. 59)

> The vocational expert testified that 600 local and 230,000 national jobs as a final assembler [exist].  The [VE] therefore stated that half of the local jobs and all of the national jobs of [job] group[ing] 51-9399 were as a final assembler to the exclusion of the 1,586 other occupations in this group . . . . The [VE] estimated that 8% of the local but 30% of the national jobs in [job] group[ing] 51-9061 were [t]able [w]orker jobs to the exclusion of 781 other DOT classifications [in that grouping] . . . . The [VE] . . . estimated that 1.3% of the regional and 6% of the national jobs in [job] group[ing] 43-9061 were [d]ocument [p]reparer jobs to the exclusion of other 71 unique DOT codes [in that grouping].  The disconnect and complete lack of symmetry . . . coupled with the additional evidence robs the testimony of the [VE] of the classification of 'substantial' evidence.

(Id. at 59-60).

Plaintiff's argument that these statistics render the VE's testimony unreliable and an inadequate basis for the ALJ's decision

is without merit.  As discussed <u>supra</u>, a VE's "recognized expertise provides the necessary foundation for his or her testimony.  Thus, no additional foundation is needed."  <u>Bayliss</u>, 427 F.3d at 1217. Here, the VE — whom the parties stipulated was a qualified expert (AR 60) — did not specify the methodology he used to determine the number of existing jobs that Plaintiff could perform, (AR 60-68), nor was he required to do so.  <u>See</u> <u>id.</u>; <u>Brault</u>, 683 F.3d at 448-49 (an ALJ need not expressly state his reasons for accepting a VE's testimony and an ALJ need not inquire into a VE's methodologies). During the hearing before the ALJ, Plaintiff's counsel had the opportunity to question the VE regarding how he calculated the number of existing jobs and whether there was any risk of "aggregation error."  Plaintiff's counsel, however, chose not to do so.  (AR 60-68).  Accordingly, Plaintiff cannot undermine the reliability of the VE's testimony by after-the-fact speculation or the introduction of statistics that have not been analyzed by an expert and are derived from non-authoritative sources.  <u>See</u> 20 C.F.R. § 404.1566(d).

Moreover, when evidence "is susceptible to more than one rational interpretation," the Court must uphold the ALJ's decision. <u>Thomas v. Barnhart</u>, 278 F.3d 947, 954 (9th Cir. 2002).  Therefore, even if Plaintiff's evidence provided a rational basis for disagreeing with the ALJ's decision, the Court must still uphold the ALJ's finding so long as it was based on substantial evidence. For the reasons discussed above, the ALJ's decision was supportedby

1  substantial evidence and Plaintiff's claim fails.[36]  Because the

2  ALJ properly relied on the VE's opinion, the Court finds no

3  reversible error.  See Osenbrock v. Apfel, 240 F.3d 1157, 1163 (9th

4  Cir. 2001) (VE testimony constitutes substantial evidence

5  supporting ALJ's finding).  Plaintiff is not entitled to remand on

6  this claim.

7

8  **VI.  CONCLUSION**

9

10       Consistent with the foregoing, and pursuant to sentence four

11  of 42 U.S.C. § 405(g),[37] IT IS ORDERED that judgment be entered

12  AFFIRMING the decision of the Commissioner and dismissing this

13  action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve

14  copies of this Order and the Judgment on counsel for both parties.

15

16  DATED: November 21, 2013        ___/S/_____

17                                  SUZANNE H. SEGAL
                                    UNITED STATES MAGISTRATE JUDGE

18

19  ─────────────────

20       [36]   Plaintiff's reliance on Farias v. Colvin, No. 11–57088,
2013 WL 2151422 (9th Cir. May 20, 2013) (J. Stip. at 66), is also
21  misplaced because there the Ninth Circuit specifically observed
that the VE "properly testified that a person with [plaintiff's]
22  characteristics and RFC could perform the job requirements of
head dance hall hostess but erroneously provided employment data
23  for restaurant hostess — an occupation that exists in far larger
numbers," and that "the employment numbers reported by the Bureau
24  of Labor Statistics for the occupation of restaurant host/hostess
are very similar to the numbers the VE proffered for the job of
25  head dance hall hostess."  2013 WL 2151422, at *1.

26       [37]   This sentence provides: "The [district] court shall
27  have power to enter, upon the pleadings and transcript of the
record, a judgment affirming, modifying, or reversing the
28  decision of the Commissioner of Social Security, with or without
remanding the cause for a rehearing."